UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **JOVAN D. DANIELS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 11 C 4151 |
| ) | |
| ) | Hon. James F. Holderman |
| **LT. HICKEY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, an inmate at the Stateville Correctional Center, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants, Lieutenant John Hickey and Commander Patrick Keaty, subjected him to cruel and unusual punishment at the Kane County Adult Detention Center by requiring him to be housed in a cold cell. Plaintiff also claims that he was confined in the cold cell as a result of retaliation for a previously-filed civil claim against jail officials. This matter is before the court for ruling on Defendants' motion for summary judgment. For the reasons stated below, the motion is granted.

**STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or

determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

"'[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594-95 (7th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## **LOCAL RULE 56.1 (N.D. ILL.)**

Defendants filed a statement of uncontested material facts pursuant to Local Rule 56.1 (N.D. Ill.). Together with their motion for summary judgment, Defendants included a "Notice to Pro Se

Litigant Opposing Motion for Summary Judgment," [56] as required by circuit precedent. That notice clearly explained the requirements of the Local Rules and warned Plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See, e.g.*, *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain:
>
> (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed; and
>
> (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (C) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

The district court may rigorously enforce compliance with Local Rule 56.1. *See, e.g.*, *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." (citing *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)). Although *pro se* plaintiffs are entitled to lenient standards, compliance with procedural rules is required. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *see also Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1108 (7th Cir. 2004). "We have . . . repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005).

Despite the admonitions stated above, Plaintiff failed to file a proper response to Defendants' statement of uncontested facts. Plaintiff filed a response to the Defendants' motion but did not address the Defendants' statement of uncontested facts. Accordingly, Defendants' proposed uncontested statement of facts is deemed admitted.

Because Plaintiff is proceeding *pro se*, the Court will grant him some leeway and consider the factual assertions he makes in his summary judgment materials. However, the Court will entertain Plaintiff's factual statements only to the extent that he could properly testify about the matters asserted. Among other things, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602.

## **FACTS**

Plaintiff was an inmate of the Kane County Adult Justice Center (hereinafter, "Jail") in Kane County, Illinois, at the time of the events giving rise to this action. (Defs.' 56.1(a)(3) Statement ¶ 1.) During the relevant time periods, Defendant Patrick Keaty was employed by the Jail as the Commander of the Jail. (*Id.* ¶ 2.) Defendant John Hickey was employed by the Jail as a Correctional Officer, with one of his responsibilities being inmate classification at the Jail. (*Id.*)

Plaintiff was held in the Jail from April 16, 2010, through May 10, 2010, and again from July 14, 2010, through August 9, 2010. (Defs.' 56.1(a)(3) Statement ¶ 4.) Prior to these detentions at the Jail, Plaintiff had previously been charged and convicted with mob action in relation to an incident that occurred at the old Kane County Jail in 2003. (*Id.* ¶ 5.) Correctional Officer Yolanda Rodriguez was one of the victims of the 2003 incident. (*Id.*) In addition, Plaintiff filed a civil lawsuit in 2005 naming several Kane County Correctional Response Team members. (*Id.* ¶ 6; *see also Daniels v.*

*Frary*, Case No. 09 C 1290 (N.D. Ill).) Neither Hickey nor Keaty are parties to that action. (*Id.*)

When processed into the Jail in both April and July of 2010, Plaintiff was classified as "red" because of the 2003 incident. (Defs.' 56.1(a)(3) Statement ¶ 16.) "Red" classification status detainees are those who exhibit, or have a history of exhibiting, blatant disregard for staff and/or rules and regulations of the Jail. (*Id.* ¶ 17.) Detainees in this level receive restricted or no privileges. (*Id.*) The "red" classification affected Plaintiff's lock-down time, his privileges, and the commissary items he could purchase. (*Id.* ¶ 16.) Plaintiff was placed in cell M-9 in the medical unit as a measure of security to protect other inmates and staff and to prevent another incident like the 2003 incident from happening again. (*Id.*) Housing assignments in the Jail are made with considerations of security. (*Id.* ¶ 18.) Because of the number of inmates at the Jail, security risks, and personnel concerns related to Plaintiff's previous involvement in the 2003 "riot," the medical unit was deemed the only secure place to house Plaintiff. (*Id.* ¶ 22.)

When booked in the Jail in April and July 2010, Plaintiff was issued two pairs of socks, two pairs of orange pants, two t-shirts, and two boxer shorts, along with a towel, face cloth, mattress, mattress cover, and a blanket. (Defs.' 56.1(a)(3) Statement ¶ 19.) Inmates have access to all of their clothing at once while in their cell. (*Id.*) Inmates are allowed to purchase thermal tops and bottoms. (*Id.*)

When Plaintiff was first brought to the medical unit by Hickey on April 16, 2010, he was brought to unit M-7. (Defs.' 56.1(a)(3) Statement ¶ 23.) However, both Plaintiff and Hickey noticed that cell M-7 was cold. (*Id.*) Therefore, Hickey agreed to move Plaintiff to another open cell, cell M-9. (*Id.*) In addition, even though Plaintiff was on "red" classification status, he was given some "yellow" privileges. (*Id.* ¶ 24.) For example, Plaintiff had access to his blanket and mattress in his

5

cell for the full day, which is normally not allowed to detainees on "red" classification status. (*Id.*) Plaintiff would have also been allowed to purchase additional clothing items. (*Id.*)

Cell M-9 is located in the medical area of the Jail, which is in a different wing of the Jail than other housing units. (Defs.' 56.1(a)(3) Statement ¶ 13.) The unit consists of 8 double cells and cells 9 and 10, which are single cells. (*Id.*) Cells M-1 through M-6 are in a row, cells M-7 and M-8 are next to each other, and cells M-9 and M-10 are next to each other. (*Id.*) The medical unit is used for both inmates with medical conditions and for non-medical inmates when the Jail is at full capacity. (*Id.* ¶ 14.) Inmates in the medical unit are generally in their cells for most of the day. (*Id.*) Because the medical unit is a single-story wing, the vent for the air conditioning is located in the ceiling, which may blow directly on an inmate in the cell. (*Id.* ¶ 15.) In other housing units, inmates are usually housed in double cells and are put in a common area during the day; these units are in two-tier wings. (*Id.* ¶ 14.)

On April 16, 2010, Plaintiff's first day at the Jail, he submitted a grievance complaining about his classification status and he requested to be moved to another cellblock. (Defs.' 56.1(a)(3) Statement ¶ 44.) This grievance did not mention the temperature of his cell. (*Id.*) On April 17, 2010, Plaintiff wrote a two-page, single-spaced letter to Keaty in which he complained about a range of issues. (*Id.* ¶ 45.) The letter included a complaint that "it's extremely cold back here." (*Id.*) Hickey reviewed Plaintiff's letter and responded on April 19, 2010. (*Id.* ¶ 46.) With regard to the temperature issue, Hickey stated, "per your request, we placed you in a warmer room upon arrival and initial placement." (*Id.*)

On April 19, 2010, Plaintiff wrote a letter to Hickey regarding various issues, including the temperature of his cell. (Defs.' 56.1(a)(3) Statement ¶ 47.) Plaintiff's letter stated that although he

6

requested to be placed in a warmer cell, the cell he was given "is as cold as any given winter day." (*Id.*) Plaintiff wrote that he had to wear a blanket all day and that he was so uncomfortable that he could not sleep at night. (*Id.*) Hickey responded to the letter: "As far as the room is concerned: Unfortunately we sometimes have problems regulating the heat throughout the jail. It is not a localized problem in the area you are being housed. Our maintenance staff is working to resolve the issue." (*Id.* ¶ 48.)

On April 21, 2010, Plaintiff submitted two separate grievances, neither of which mentioned the temperature of his cell. (Defs.' 56.1(a)(3) Statement ¶ 49.) Plaintiff submitted another grievance of April 27, 2010, that did not include any complaints about the temperature of his cell. (*Id.*)

Plaintiff also wrote a letter to Hickey on April 27, 2010, regarding several issues. (Defs.' 56.1(a)(3) Statement ¶ 50.) Plaintiff wrote that "it's extremely cold back here, I have no thermal top or bottom so could you also have maintenance turn up the heat. If not, I could use a second blanket." (*Id.*)

On April 29, 2010, Plaintiff filed a grievance regarding the temperature in his cell, M-9, complaining "how it was extremely cold and unfit to reside in." (Defs.' 56.1(a)(3) Statement ¶ 7.) Plaintiff requested the heat be turned up and/or that he be moved to another cell. (*Id.* ¶ 8.) Plaintiff complained that the cold was causing his feet, hands, and head to have a constant chill and that at night he shivered and curled up in a ball in an attempt to keep warmer. (*Id.* ¶ 51.) As a result of the excessive cold, Plaintiff developed a cold that consisted of a runny nose and a cough. (*Id.* ¶¶ 8, 57.) The cold lasted a week or week and a half and Plaintiff took aspirin for the cold. (*Id.* ¶ 57.) However, Plaintiff did not seek any medical treatment for any illness related to the cold. (*Id.* ¶ 70.) On April 30, 2010, the Maintenance Log at the Jail indicates that a complaint was received from the Jail staff

that the medical unit was very hot. (*Id.* ¶ 52.)

On May 6, 2010, Lt. Flowers responded to Plaintiff's April 29, 2010, grievance. (Defs.' 56.1(a)(3) Statement ¶ 53.) Flowers responded that he had checked the temperatures in Plaintiff's cell, the cell next to Plaintiff's cell, and the common area outside of cell M-9 and found that the temperature ranged from 70.1 degrees to 73.0 degrees. (*Id.*) Plaintiff did not submit any additional grievances through May 10, 2010, when he was transferred to another facility. (*Id.* ¶ 55.)

Plaintiff returned to the Jail on July 14, 2010, and he was again classified as "red" for his past behavior and he was again assigned cell M-9. (Defs.' 56.1(a)(3) Statement ¶ 58.) On July 15, 2010, Plaintiff submitted a grievance regarding the temperature of his cell. (*Id.* ¶ 59.) Plaintiff complained that the "constant extreme chill" was "unbearable" and that he believed that the temperature in his cell was as low as 50 degrees. (*Id.*) On July 19, 2010, Flowers responded to the grievance, stating that he had addressed the matter with the maintenance staff. (*Id.* ¶ 60.) Flowers also e-mailed Glenn Diller, the Kane County Sheriff's Maintenance Supervisor, and Jim Hinkle, Kane County Building Engineer, relaying the complaint of cold temperatures and requesting assistance. (*Id.* ¶¶ 33, 61.)

On July 29, 2010, Plaintiff submitted a second grievance complaining that he had submitted several grievances regarding the temperature in his cell being between 45 and 50 degrees and that he had to wear every piece of linen he had in his cell to try to stay warm. (Defs.' 56.1(a)(3) Statement ¶¶ 9, 62.) He also complained that he was confined to his bunk all day wrapped in his blanket to try to stay warm and that he did not shower because he "was afraid to take a shower for fear of catching pneumonia." (*Id.* ¶ 9) The same day, Plaintiff requested that he be moved or for the heat to be turned up in his cell, to no avail. (*Id.* ¶ 10.) On July 30, 2010, Plaintiff was issued two blankets rather than the standard one blanket. (*Id.* ¶ 65.) Plaintiff did not actually measure the

temperature in his cell and he was "guesstimating on the temperature." (*Id.* ¶ 69.)

On August 2, 2010, an unknown employee responded to Plaintiff's grievance, stating that he had spoken to Hickey about Plaintiff's cell being cold and that Hickey responded that Plaintiff could not be moved due to his classification and for security concerns arising from the 2003 incident. (Defs.' 56.1(a)(3) Statement ¶¶ 11, 63.) That same day, the employee addressed the matter with an unknown maintenance supervisor, but the cell remained cold. (*Id.* ¶ 12.) The employee also told Plaintiff that he had sent the grievance to Keaty so that Keaty would be aware of the situation. (*Id.*) Flowers also sent an email to Hinkle, Diller, and Keaty regarding the complaints about cold cells in the unit. (*Id.* ¶ 66.) Flower's email stated that he was still getting complaints, that he needed the issue addressed "ASAP," and that several individuals had verified that "it is very cold." (*Id.*) When Flowers sent the message, he was not yet aware that Hinkle and Diller had recently had meetings with an outside contractor to provide a permanent solution to the temperature issues. (*Id.* ¶ 67.) Flowers recalls that the temperature in the medical unit did not feel as if it was below 70 degrees during April, May, July, and August of 2010. (*Id.* ¶ 68.)

At some point during Plaintiff's detention at the Jail, Hinkle was aware of several complaints a day in the Jail. (Defs.' 56.1(a)(3) Statement ¶ 33.) The complaints were both of hot and cold temperatures in different areas at the same time. (*Id.*) During this time, Hinkle worked almost every day to monitor and regulate the temperatures at the Jail. (*Id.* ¶ 34.) Hinkle is not aware of any temperature lower than 60 degrees or above 85 degrees in any of the internal, non-pipe chase areas of the Jail during any time. (*Id.*) During the relevant time period, only Kane County Facility Division employees had control over the temperature set points in the Jail. (*Id.* ¶ 35.) Neither Keaty nor Hickey had access to set or control the temperature in the Jail generally or in cell M-9 specifically.

(*Id.*) Temperatures cannot be changed or set for individual cells within the Jail. (*Id.* ¶ 38.)

Hickey is generally in the medical unit at least once a week as part of his job duties. (Defs.' 56.1(a)(3) Statement ¶ 39.) He does not recall noticing any extremely cold temperatures in that unit in the Spring and Summer of 2010, with the exception of medical cells 7 and 8, which were colder than other cells. (*Id.*) Neither Hickey nor Keaty personally observed cell M-9 to be excessively or uncomfortably cold. (*Id.* ¶ 43.) During the time that cells 7 and 8 were noticed to be cold, the detainees in those cells were given additional blankets. (*Id.* ¶ 40.) The Kane County Sheriff's Office only received one other written complaint, on April 29, 2010, about it being cold in the medical unit during the relevant time periods. (*Id.* ¶ 41.)

The Jail was built in 2006 and opened in September 2007. (Defs.' 56.1(a)(3) Statement ¶ 26.) The heating, ventilation, and air conditioning (HVAC) units are housed on the roof of the Jail. (*Id.* ¶ 27.) Temperatures are controlled by a building-wide Honeywell computerized system. (*Id.* ¶ 28.) The "set point" for the temperatures in the jail is 68-72 degrees. (*Id.* ¶ 29.)

The Jail is designed as a building within a building; the cells and housing units are contained within the inner walls and in between the inner and outer walls is a plenum, or "pipe chase" area, or hallway, that contains various maintenance items. (Defs.' 56.1(a)(3) Statement ¶ 30.) The pipe chase is also used as an air return for the cells. (*Id.*) Since the pipe chase area is between the inner and outer walls, this area tends to get colder than the cells in the winter and warmer than the cells in the summer. (*Id.* ¶ 31.)

Initially the Jail was designed with many temperature sensors for the thermostats located within the pipe chase area, which, in part, caused some general heating and cooling problems within the Jail. (Defs.' 56.1(a)(3) Statement ¶ 30.) These problems were not fully resolved until an outside

consultant redesigned the HVAC system in the fall of 2010. (*Id.*)

The particular temperature sensor and rooftop HVAC unit which serve medical cell M-9 are designated by the label RTU E-1. (Defs.' 56.1(a)(3) Statement ¶ 36.) RTU E-1 controls the entire medical area including the exam rooms, offices, and cells. (*Id.*) The system also utilizes variable air volume (VAV) units that have heating coils to regulate the temperatures if they sense the air is too cold. (*Id.* ¶ 37.) Cell M-9 has its own VAV. (*Id.*) Hinkle has checked the VAV for cell M-9 and found that it is in good working condition and that it has never needed repair. (*Id.*)

At some point during his detention at the Jail, Plaintiff had a conversation with Hickey in which Hickey told Plaintiff that he had to be placed in cell M-9 because of his prior actions at the Jail. (Defs.' 56.1(a)(3) Statement ¶ 73.) Plaintiff replied that because the incident had occurred seven years ago, he felt that his placement was based on a pending lawsuit. (*Id.*) Hickey then responded that "you shouldn't have taken it that far." (*Id.*)

Plaintiff and Keaty did not have any direct contact with Plaintiff while he was detained at the Jail. (Defs.' 56.1(a)(3) Statement ¶ 77.) Keaty was aware that there were issues with the temperatures throughout the Jail in 2010, but he was not aware of any portion of the Jail ever being colder than 60 degrees. (*Id.* ¶ 78.) Keaty had weekly meetings with Diller and Hinkle regarding various maintenance issues in 2010. (*Id.* ¶ 79.)

## **ANALYSIS**

A two-part analysis is undertaken when a prisoner challenges the conditions of his confinement. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). The conditions at issue must be "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)

(internal quotation marks omitted). The prison conditions may be uncomfortable and harsh without violating the constitution. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The deprivations must be "extreme" for a conditions-of-confinement claim. *See Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001). Minimal decency requires the prison to provide reasonably adequate protection from the cold. *See Dixon*, 114 F.3d at 643. In assessing whether cold cell temperatures constitute cruel and unusual punishment, courts consider several factors, including "the severity of the cold; its duration, whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.* at 644. However, no one factor or combination of factors "is necessarily determinative of a claim's success or lack thereof." *Id.*

If the court finds that the conditions are objectively, sufficiently serious, the plaintiff must then demonstrate that the prison official acted with deliberate indifference to the prison condition. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Townsend*, 522 F.3d at 773. "Deliberate indifference" means that the prison official knew that that the inmate faced a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures to address that risk. *See Farmer*, 511 U.S. at 847; *Townsend*, 552 F.3d at 773.

Plaintiff has not established that he was exposed to excessively cold temperatures that subjected him to a "substantial risk of serious harm." The only evidence Plaintiff presents to support the alleged extreme cold is his say-so, which he admits is a guesstimate. Contrary to his two complaints that the temperature in his cell was between 45 and 50 degrees (based on this "guesstimate"), the measured temperature in Plaintiff's cell and the areas near his cell ranged from 70.1 degrees to 73.0 degrees. The set point for the heating cooling system is 68-72 degrees. Neither

12

Defendant personally observed the Plaintiff's cell to be excessively cold and Hinkle, who was in charge of monitoring and controlling the temperatures in the Jail, was not aware of any temperature lower than 60 degrees in any of the internal, non-pipe chase areas of the Jail during the relevant time periods. Flowers recalls that the temperature in the medical unit did not feel as if it was below 70 degrees during April, May, July, and August of 2010. While Plaintiff did submit complaints about the temperature in his cell multiple times, there were no widespread complaints by other detainees in the unit of excessive cold. In addition, Plaintiff had alternative means to protect himself from the cold as he was provided clothing and bedding at all times to address his complaints that he was cold. Lastly, Plaintiff did not allege that he endured any other adverse conditions and suffered no serious effects from the cold.

Even if Plaintiff's cell was colder than he found comfortable, his conditions of confinement did not rise to the conditions of confinement that have been found to constitute a substantial risk of serious harm. In addressing a similar claim, the Southern District of Illinois collected the following cases:

> *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) (temperatures in the cell averaging 40 degrees Fahrenheit and regularly falling below freezing for four consecutive winters); *Murphy v. Walker*, 51 F.3d 714, 720-21 (7th Cir. 1995) (allegation of unheated cell and no blankets or clothing for a 1½ weeks); *Del Raine v. Willford*, 32 F.3d 1024, 1036 (prisoner housed in cell with broken window in which temperature was near outdoor temperature including a period of two days where wind chills were from -40 to -50 degrees Fahrenheit); *see also Henderson v. DeRobertis*, 940 F.2d 1055, 1056-1061 (7th Cir. 1991) (finding an Eighth Amendment violation clearly established where conditions included broken windows, below freezing temperatures inside the cell, no winter clothing, lack of extra blankets, and a malfunctioning heating system over period of four days in which temperature fell to -22 degrees Fahrenheit outside).

*Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 880 (S.D. Ill. 2009). While Plaintiff has established that

his cell was cold during part of his two detentions at the Jail due to the HVAC system at the Jail, his conditions of confinement are clearly distinguishable from the above described circumstances. Plaintiff has not and cannot present authority suggesting that a summertime cell temperature in the 60 degree to 70 degree range deprives a detainee of constitutionally adequate warmth. *See also Dace*, 658 F. Supp. 2d at 879-81 (finding lack of substantial risk of harm based on evidence that plaintiff was exposed to "excessively cold" temperatures for three weeks in December that caused plaintiff to "bundle up" to stay warm and caused plaintiff to catch a cold); *Hagemann v. Schmitz*, Case No. 10 C 026, 2011 WL 38996, at *3-5 (E.D. Wis. Jan. 5, 2011) (Griesbach, J.) (finding lack of substantial risk of harm based on allegation that plaintiff was housed in freezing cold cell in July and August where measured temperature in the cell was 71.8 degrees, staff did not observe cold temperatures, and there were no complaints from others in the areas regarding excessive cold).

Based on the above, Plaintiff has failed to demonstrate that the conditions of his confinement posed a substantial risk of serious harm.

Even if Plaintiff had established a genuine issue of fact as to whether his cell was unconstitutionally cold, he has not demonstrated that the Defendants were deliberately indifferent to his claims. Plaintiff was given clothing and blankets and he was allowed to retain his bedding for the day even though, based on his red classification, the bedding should have been removed from his cell on a daily basis. The undisputed facts also show that both Defendants made attempts to address Plaintiff's concerns by contacting the appropriate maintenance staff about the complaints. In addition, neither Defendant had actual control over the temperature settings in the Jail. While Plaintiff argues that he should have been moved to a different cell, as explained in the response to his complaints and grievances, Plaintiff could not be moved due to his red classification in light of his involvement in

the 2003 riot at the Jail. Thus, Plaintiff fails to present any evidence demonstrating that the Defendants were "deliberately indifferent." *See Dace*, 658 F. Supp. 2d at 880-81) (finding lack of deliberate indifference where plaintiff had clothing and bedding in his cell and defendants made efforts to correct the situation by submitting work orders); *Hagemann*, 2011 WL 38996, at *3-5 (finding lack of deliberate indifference where defendants responded to plaintiff's complaints and monitored temperature of the area). There is no triable issue as to whether the Defendants acted with deliberate indifference.

Plaintiff also raised a retaliation claim in his complaint. Defendants have moved for summary judgment on the retaliation claim and Plaintiff did not address the claim whatsoever in his response to the Defendants' motion.

To prevail on a claim of retaliation under the First Amendment, a plaintiff must establish that: (1) he engaged in a protected activity; (2) he suffered a deprivation likely to prevent future protected activities; and (3) there was a causal connection between the two. *See Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *see also Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). It is well established that an act taken against an inmate in retaliation for his exercise of his First Amendment rights may form the basis of a civil rights suit, even if the same act, when taken for a different reason, would be otherwise permissible. *See, e.g.*, *Stanley v. Litscher*, 213 F.3d 340, 343 (7th Cir. 2000); *DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 2000); *Bridges*, 557 F.3d at 541.

Here, Plaintiff engaged in the protected activity of filing a lawsuit in 2005. *See Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005). However, Plaintiff has not established a causal connection between his lawsuit and being placed in cell M-9. To establish a causal connection, the plaintiff bears the burden of demonstrating that but for the protected conduct, the defendant would not have taken

15

the adverse action. *See Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009).

Defendants have shown that Plaintiff was placed in the medical division of the Jail because of his red classification and the medical division is the area in the Jail were such detainees are housed for the safety of other detainees and Jail staff. Plaintiff could not be moved from the area for that same reason. In addition, neither of the present Defendants were a party to the previous lawsuit. No reasonable trier of fact could find, on the basis of the evidence in the record, that Plaintiff's placement was based on retaliatory animus, as opposed to legitimate security concerns.

In conclusion, no material facts are in dispute, and Defendants have established that they are entitled to judgment as a matter of law. Accordingly, Defendants' motion for summary judgment is granted.

If Plaintiff wishes to appeal this final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the $455 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Plaintiff may also be assessed a "strike" under 28 U.S.C. § 1915(g). The Plaintiff is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [47] is granted. The

Clerk is directed to enter judgment in favor of the Defendants pursuant to FED. R. CIV. P. 56. The case is closed.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: October 5, 2012